UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

JEAN MENGHINI,                          :

                    Plaintiff,          :        Civil Action No.:

                                        :

        v.                              :        **COMPLAINT**

                                        :

NEUROLOGICAL SURGERY, P.C., DR.         :
MICHAEL BRISMAN, DR.  RAMIN RAK, DR.    :        **Jury Trial Demanded**
PAOLO BOLOGNESE, and DR. WILLIAM        :
SONSTEIN,                               :

                                        :

                    Defendants.         :

------------------------------------------------------------ x

Plaintiff Jean Menghini hereby states and alleges as follows:

## PRELIMINARY STATEMENT

1.      Ms. Menghini, a long tenured physician assistant ("PA") at Neurological Surgery,

P.C. ("NSPC"), was fired after she repeatedly complained both (i) that she observed what she

believed were unsafe surgical practices by multiple surgeons – including complaints that one

surgeon, *Dr. Paolo Bolognese, who has been sued at least 20 times for medical malpractice,*

*takes unnecessarily long breaks during surgeries,* *leaving his patients under anesthesia for*

*longer than the surgery is required*, and that as to another surgeon, "*Dr. Ramin Rak is*

*becoming a dangerous surgeon*" – and (ii) that she had been sexually harassed and subject to

misogynistic behavior by numerous surgeons.  By way of example, NSPC's surgeons repeatedly

made comments – very often mid-surgery –  such as "*All you women, all you do is complain*,"

"*When was the last time you had sex?*" "*[My daughter has] got young perky C-cup breasts,*"

"*If your brains were as big as your breasts, you'd be a genius,*" "*Fuck me in the ass,*"  "*My*

*wife is my servant*," and "*Most women who rise to power have done so with their legs open.*"

After being subjected to an onslaught of unlawful conduct prior to her complaints, Ms. Menghini

was retaliated against after "blowing the whistle," which concluded with Dr. Michael Brisman terminating her employment.

2.      When Ms. Menghini was fired, she was offered – unconditionally – eight weeks of severance pay.   Ms. Menghini accepted this offer in writing.  However, incredibly, after Ms. Menghini complained that her termination was unlawful and retaliatory, Defendants further retaliated against her by refusing to pay her the agreed upon severance payments and telling her that the severance payments would only be made if she released all claims she had against NSPC and its surgeons.

3.      Ms. Menghini, by filing this lawsuit, seeks redress for the unlawful conduct committed against her, as well as to end Defendants' unlawful employment practices once and for all.  Ms. Menghini seeks declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Dr. Brisman's, Dr. Rak's, Dr. Sonstein's, Dr. Bolognese's and NSPC's unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York Labor Law ("NYLL"), N.Y. Labor Law §§ 215 *et seq.* and 741 *et seq.*, the New York State Human Rights Law ("NYSHRL"), and New York State common law.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

6.     Any and all other administrative prerequisites have been met.

## ADMINISTRATIVE PROCEDURES

7.     Prior to the commencement of this action, Ms. Menghini filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 16, 2015 alleging violations of Title VII and received a Notice of Right to Sue from the EEOC on June 9, 2015.

8.     Following the commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the NYCHRL.

9.     Pursuant to NYLL § 215(2)(b), contemporaneously with the commencement of this action, Plaintiff will serve a copy of this Complaint upon the Office of the Attorney General, providing notice of the claims set forth in this action.

10.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

11.     Plaintiff Jean Menghini is a female former employee of NSPC.  Ms. Menghini was terminated from her position as a PA at the Company's 100 Merrick Road, Suite 128W, Rockville Centre, New York 11570 location on March 9, 2015.  She is a resident of the State of New York and at all relevant times met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

12.     Defendant NSPC is a private neurosurgery group, with a practice focusing on brain and spine surgery.  NSPC is a domestic professional corporation organized under the laws of the State of New York with ten offices located throughout Long Island and the tri-state area, and maintains its principal office at 100 Merrick Road, Suite 128W, Rockville Centre, New York 11570.  At all relevant times, NSPC was an "employer" within the meaning of all applicable statutes.

13.     Defendant Dr. Michael Brisman is a resident of the State of New York and the Chief Executive Officer ("CEO") of NSPC.  Defendant Brisman directly supervised Ms. Menghini and directly participated in the unlawful conduct described herein.  Dr. Brisman was Ms. Menghini's supervisor and in that role, he had the authority to discipline and terminate Ms. Menghini, direct her work activities, assign her job responsibilities, and monitor her performance.  At all relevant times, Dr. Brisman was an "employer" within the meaning of all applicable statutes.

14.     Defendant Dr. Ramin Rak is a resident of the State of New York and a neurosurgeon at NSPC.  Defendant Rak directly supervised Ms. Menghini and directly participated in the unlawful conduct described herein.  Dr. Rak was Ms. Menghini's supervisor and in that role, he had the authority to discipline and terminate Ms. Menghini, direct her work activities, assign her job responsibilities, and monitor her performance.  At all relevant times, Dr. Rak was an "employer" within the meaning of all applicable statutes.

15.     Defendant Dr. Paolo Bolognese is a resident of the State of New York and a neurosurgeon at NSPC.  Defendant Bolognese directly supervised Ms. Menghini and directly participated in the unlawful conduct described herein.  Dr. Bolognese was Ms. Menghini's supervisor and in that role, he had the authority to discipline and terminate Ms. Menghini, direct

her work activities, assign her job responsibilities, and monitor her performance. At all relevant times, Dr. Bolognese was an "employer" within the meaning of all applicable statutes.

16. Defendant Dr. William Sonstein is a resident of the State of New York and a neurosurgeon at NSPC. Defendant Sonstein directly supervised Ms. Menghini and directly participated in the unlawful conduct described herein. Dr. Sonstein was Ms. Menghini's supervisor and in that role, he had the authority to discipline and terminate Ms. Menghini, direct her work activities, assign her job responsibilities, and monitor her performance. At all relevant times, Dr. Sonstein was an "employer" within the meaning of all applicable statutes.

## FACTUAL ALLEGATIONS

### Background

17. NSPC describes itself as "the largest private Neurosurgery practice on Long Island and in the tri-state area." It prides itself on its award-winning surgeons and its ground breaking treatments and boasts that it employs "the Best Neurosurgeons in NYC and on Long Island."

18. In 2007, Ms. Menghini began her employment with NSPC as a PA, where she was responsible for assisting NSPC physicians during surgeries at various hospitals on Long Island.

19. Ms. Menghini performed very well throughout her eight years of employment and was always highly regarded as a valuable employee as evidenced by, *inter alia*, her lengthy eight year term of employment, her transfer to more important shifts, the raises she received, and the lack of any documented performance problems.

20.     During the first few years of her employment, Ms. Menghini worked night shifts and rotated her assistance between a number of NSPC surgeons who performed surgeries at the hospitals at which she was based.

**Sexual Harassment Under Dr. Ramin Rak**

21.     In or around 2010, Ms. Menghini transferred to the day shift. As part of that transfer, she was assigned to work primarily with Defendant Dr. Ramin Rak.

22.     Dr. Rak conducted himself in a highly inappropriate and misogynistic manner, routinely making offensive comments regarding Ms. Menghini and women in general. For instance, but only by way of example, Dr. Rak's behavior included the following:

- Dr. Rak had an inflated sense of grandiosity about himself, telling Ms. Menghini and another PA: **"You can call me 'pasha' [a Persian title for the aristocracy] but not in front of my wife."**

- Dr. Rak once stated, **"All you women, all you do is complain."**

- On a number of occasions, Dr. Rak asked Ms. Menghini **"When was the last time you had sex?"**

- Dr. Rak also inquired into Ms. Menghini's **"sexual appetites,"** asking at what levels they were.

23.     Comments like these, and others, were part of Dr. Rak's normal vernacular and his sexist attitudes pervaded his work environment, including during surgical procedures.

24.     Dr. Rak also acted bizarrely every time his wife was in the hospital. For example, on one occasion, when his wife was scheduled for a minor procedure, Dr. Rak approached Ms. Menghini and informed her that she was forbidden from traversing the same corridor in which his wife was being treated.

25.     Ms. Menghini believed this was to avoid communication with his wife about the sexual harassment she was subjected to at his hands.

**Dr. Rak's Unsafe Surgical Practices**

26.     Moreover, Ms. Menghini observed that Dr. Rak often engaged in what she believed were risky medical procedures that were clearly not in the best interests of his patients, particularly with respect to a practice involving removing a piece of bone from a patient's skull.

27.     In order to access the brain during brain surgery, a piece of the skull often must be removed for a variety of reasons.  Generally, Ms. Menghini's belief was that best practices involve storing the piece of the skull – called the "bone flap" – either within another location in the body, which is a sterile environment that can keep blood flowing through the bone flap, or in a freezer, which will also preserve the flap.

28.     Ms. Menghini believed that placing the bone flap in the body is preferable to a freezer, as freezers lend themselves to contaminants.[1]  Because the skull protects the brain from injury, Ms. Menghini believed it was preferable to replace the bone flap directly after surgery, provided there is no brain swelling and that only if it is impossible to replace the bone flap should surgeons resort to placing mesh over the hole in the skull.[2]

---

[1]     This is corroborated by academic literature.  See S. Baldo & L. Tacconi, *Effectiveness and Safety of Subcutaneous Abdominal Preservation of Autologous Bone Flap After Decompressive Craniectomy: A Prospective Pilot Study*, 73 WORLD NEUROSURGERY 552 (May 2010).  Cryostoring bone flaps in freezers leads to larger risks of microbial contamination (study shows that 20% of stored bone flaps show microbial contamination).  See I.P. Bhaskar, T.J. Inglis, J. Bowman & G.Y. Lee, *Microbial Contamination Assessment of Cryostores Autogenous Cranial Bone Flaps: Should Bone Biopsies or Swabs Be Performed?*, 71 ACTA NEUROCHIRURGICA 367 (February 2013).  Freezing the bone flap also leads to bone shrinkage and significant bone loss – one study showed 60% of cranioplasties performed after freezing the flap had significant bone loss.  See A.F. Joaquim, J. P. Mattos, F. C. Neto, A. Lopes & E. de Oliveira *Bone Flap Management in Neurosurgery*, REVISTA NEUROCIENCIAS 229 (2008).

[2]     According to scholarly literature, mesh is not preferred because it involves placing a foreign object into the body, which risks infection to the patient.  When bone flaps are stored in freezers, they must be sterilized.  Most sterilization techniques (autoclaving, gamma irradiation, ethylene oxide, hydrogen peroxide) are associated with increased risk of infection after

29.     Upon information and belief, by not replacing the bone flap right away, a neurosurgeon has the opportunity to charge the patient (and the patient's insurance company) for a second surgery to place the flap back on.  Dr. Rak routinely placed patients' bone flaps in the freezer, leading to contamination, when Ms. Menghini believed he should have placed the bone flaps back onto patients' brains instead.

30.     Ms. Menghini complained that she believed Dr. Rak's medical practices were unsafe and not in the best interests of patients, escalating her complaints over time.

31.     In or around the summer of 2010, Ms. Menghini complained to Robert Mascarelli, the Chief Physician Assistant, about Dr. Rak's practices.  Mr. Mascarelli reported Ms. Menghini's complaints to Defendant Dr. Michael Brisman.  Finally, Dr. Brisman followed up with Ms. Menghini.  However, Dr. Brisman's response was underwhelming at best.

32.     Dr. Brisman merely stated to Ms. Menghini: "I'll follow up."

33.     No follow up was ever made and Dr. Rak's practices never changed.

34.     On one occasion, by way of example only, Ms. Menghini assisted Dr. Rak with a procedure to treat a chronic subdural hematoma, which involved removing a bone flap as part of the treatment.

35.     Upon completion of the surgery, Dr. Rak did not replace the bone flap because it had become contaminated after being placed in the freezer.  Instead, Dr. Rak placed some mesh onto the patient's brain instead.  As a result, the area surrounding the mesh became infected.

---

reimplantation into patient.  See S. Elwatidy, *Preservation and Restoration of Cranial Bone Flaps*, King Saud University, assignee. Patent US 8382844 B2 (October 2008).  See also G.C. Park et al., *Comparison of the Results of Cranioplasty Using Refrigerated Autogenous Bone Flap and MethyMetacrylate*, 12 J. KOREAN NEUROSURGICAL SOC., at 51 (2001) ((placement of foreign bodies may increase risk of postoperative infection); H.D. Mollman & S.J. Haines, *Risk Factors for Postoperative Neurosurgical Wound Infection. A Case-Control Study*," 64 J. NEUROSURGERY 902 (1986).

Upon viewing the patient's post-operative magnetic resonance image ("MRI"), Ms. Menghini exclaimed to Dr. Rak: **"This MRI is a disaster!"**  The MRI reflected an infection that had penetrated deep within the brain.

36.    Even upon learning about the extensive infection, however, Dr. Rak did not take immediate action to remedy his missteps with his patient.  Instead, he prioritized a "VIP" patient who was scheduled for an elective surgery, but who had an insurance policy that would pay Dr. Rak significant fees.  Only after completing the "VIP"'s surgery did Dr. Rak fix the error and operate on the patient whose surgery he had previously botched.

37.    Witnessing what she believed to be the unnecessary, extremely dangerous position into which Dr. Rak had placed the patient, Ms. Menghini felt compelled to speak up.  Ms. Menghini again complained to Mr. Mascarelli, the Chief PA, exhorting Mr. Mascarelli that **"Dr. Rak is becoming a dangerous surgeon."**

38.    Mr. Mascarelli then escalated Ms. Menghini's complaint to Dr. Michael Brisman, another neurosurgeon in the practice.  Dr. Brisman eventually called Ms. Menghini to discuss her complaint, but was entirely dismissive of her concerns.  He again simply stated that he would "look into it," and would follow up with Ms. Menghini.

39.    Dr. Michael Brisman never followed up.

40.    In addition to the bone flap procedures, Ms. Menghini also noticed that Dr. Rak had the habit of taking on surgeries for which she believed he was not well qualified, including a number of spine surgeries, and she complained about it verbally to Mr. Mascarelli.

41.    Dr. Rak is well known for his expertise in performing awake craniotomies and his specialization in treatment of brain tumors and cerebrovascular and skull base diseases.  These are brain surgeries.  However, upon information and belief, due to his inflated ego, Dr. Rak

attempts surgeries for which Ms. Menghini believes he is not qualified, including spine surgeries.[3]

**Retaliation Against Ms. Menghini for her Complaints Against Dr. Rak**

42.     Immediately following Ms. Menghini's complaint about the patient whose "MRI [was] a disaster," Dr. Rak began treating Ms. Menghini differently and more harshly.  Doubtless furious with Ms. Menghini for reporting his dangerous behavior, Dr. Rak treated Ms. Menghini with increasing levels of hostility and sexually explicit harassment.

43.     Leading up to the 2010 holiday party, Dr. Rak asked Ms. Menghini, "**Are you taking a man or a woman to the [holiday] party?**" in front of a whole group of surgeons in the surgical lounge.  Ms. Menghini did not believe that her sexuality was any of Dr. Rak's business, but Dr. Rak's inquiry foreshadowed his future retaliation against Ms. Menghini.

44.     During NSPC's 2010 holiday party, Dr. Rak and his wife, Golnoosh Ghatri, as well as Ms. Menghini, were all in attendance.  Ms. Menghini and a number of other female PAs were all dancing together on the dance floor when Dr. Rak's wife joined them on the dance floor.  Ms. Menghini had only met Dr. Rak's wife in passing (in part because she was forbidden from seeing her in the hospital), and barely knew who she was.

---

[3]     See *Longo, et al. v. Rak, et al.*, No. 65074/2014 (N.Y. State Sup. Ct., Cty. of Suffolk, filed July 2, 2014) (lack of informed consent, loss of services, negligent hiring – defendants failed to heed plaintiff's condition, failed to perform tests, performed a negligent posterior lumbar fusion surgery leading to a compression of plaintiff's spinal cord, failed to recognize surgical emergency, failed to perform remedial procedures, failed to diagnose plaintiff's condition, failed to order MRI or CT scans of the spine causing plaintiff to undergo subsequent surgeries, negligently documented plaintiff's chart, inadequately communicated among doctors and nurses, failed to hire competent help, failed to perform necessary diagnostic procedures, failed to perform necessary diagnostic tests, departed from accepted practice and services rendered, failed to properly administer drugs and/or antiobiotics, failed to properly perform surgical procedures causing nerve damage and gait instability).

45.    Irrationally jealous of his wife paying attention to anyone but him, when Dr. Rak saw his wife dancing with the group, he became furious. Dr. Rak caused a scene, embarrassing his wife by dragging her off the floor by her arm.

46.    During the next surgery in which both Dr. Rak and Ms. Menghini scrubbed into together, he accosted her. While the patient was under anesthesia, with the spine open and exposed, Dr. Rak demanded of Ms. Menghini: "**Are you after my wife?**" Confused and taken aback, Ms. Menghini asked Dr. Rak to clarify. He again asked: "**Are you after my wife?**" Ms. Menghini replied, "If you're asking if I'm going to hurt her, the answer is no!" Dr. Rak then clarified: "**The way you were dancing with her on the dance floor. It's like you're at war with me. Are we at war?**"

47.    Thereafter, Dr. Rak's behavior quickly became even more hazardous. Having completed the surgery, Dr. Rak and Ms. Menghini were closing up the patient and suturing together. Dr. Rak was placing threads, while Ms. Menghini was following behind him, tying the individual knots. Dr. Rak was moving far too quickly, not taking appropriate care, and either with specific intent or because he was acting recklessly, stabbed Ms. Menghini with a needle. Ms. Menghini exclaimed: "**You stuck me!**" Ms. Menghini was forced to immediately scrub out of the surgery and went to the emergency room for treatment of her own.

48.    Unless intentional, it seemed highly improbable that after years of working as a PA, the first and only time Ms. Menghini was stuck by a needle handled by a physician was directly after her confrontation with Dr. Rak. The following day, when Dr. Rak was performing a surgery, he proceeded to mock Ms. Menghini to those present for her reaction to his assault against her, claiming that she had overreacted, even though he had stabbed her with a needle

resulting in injury and extreme anxiety due to potential contamination from the patient on whom they were operating.

49.     Ms. Menghini yet again reported Dr. Rak's dangerous and inappropriate behavior to Dr. Brisman.  This time, Dr. Brisman retaliated against Ms. Menghini for complaining about the sexual harassment and battery she experienced.  Dr. Brisman told Ms. Menghini that he did not believe her report.  Dr. Brisman also minimized the stabbing incident, waving it off, saying: "I'm sure that was an accident."  No investigation into Ms. Menghini's complaint was ever done.

50.     To the contrary, rather than investigate Ms. Menghini's complaint and discipline Dr. Rak and/or take other remedial measures to address all the concerns Ms. Menghini had raised about Dr. Rak, Dr. Brisman only transferred Ms. Menghini from her position.  There were no consequences for Dr. Rak for his discriminatory behavior, the potentially unsafe manner in which he practiced medicine, or his retaliatory conduct towards Ms. Menghini.

**Continuing Hostile Work Environment Following Transfer**

51.     When she was transferred, Ms. Menghini began working for, among others, Dr. William Sonstein and later Dr. Paolo Bolognese.  However, these doctors also exhibited extremely discriminatory, misogynistic behavior with impunity.

52.     By way of example only, on one occasion during the summer of 2014, Dr. Sonstein, Ms. Menghini, and another doctor were sitting in the doctor's lounge at North Shore Long Island Jewish–Plainview Hospital talking amongst themselves.  There were also a number of other doctors sitting in the lounge, checking their email, updating their charts, and speaking quietly.  At the time, Ms. Menghini reported to Dr. Sonstein and would assist him in preparing for surgeries by providing him with the necessary studies and material.

53.     All of a sudden, Dr. Sonstein turned to the subject of his *daughter*, and he complained that she should not wear such baggy clothes because "**she's got young perky C-cup breasts.**" Horrified, Ms. Menghini retorted: "**Maybe she's wearing oversized clothes because she's uncomfortable with you fixating on them.**" The other doctor sitting with them then muttered to Ms. Menghini, "**What's wrong with him?**" Clearly upset with her response, Dr. Sonstein attempted to put Ms. Menghini in her place, declaring: "**If your brains were as big as your breasts, you'd be a genius.**"

54.     This was certainly not the first occasion on which Dr. Sonstein made an inappropriate comment about his daughter. In fact, during that same summer, Dr. Sonstein had remarked to some other individuals, also in public, that he loved when his daughter's friends were over at his house because he enjoyed watching them as "**they run around in their little short shorts.**"

55.     Working under Dr. Paolo Bolognese was more of the same. From the first surgery Ms. Menghini worked with Dr. Bolognese, she was shocked and appalled with his language. No fewer than ten times through the course of that particular surgery, he exclaimed, "**Fuck me in the ass!**" when confronted with anything at all that did not go his way. When Dr. Bolognese was making a particular point with emphasis, he would add a numeral to the end of the exclamation, such as "**Fuck me in the ass *seven* times!**"

56.     The language was shocking, abrasive, and entirely offensive for the workplace. Ms. Menghini soon realized that this was not an anomaly or an exception to the rule, but rather Dr. Bolognese's standard operating procedure, and he appeared to enjoy getting a rise out of those around him when he made such salacious comments. Ms. Menghini learned that when

preparing for surgery, she had to prepare herself for a constant refrain about being "**Fucked in the ass.**"

57.    Dr. Bolognese also threatened Ms. Menghini in that surgery, at one point telling her: "**If you move that instrument, I'm going to have you killed**."   While surgeries are very serious work, and even small missteps could cause irreparable damage, such threats are not conducive to workplace safety.

58.    Also by way of example, on multiple occasions, Dr. Bolognese inquired of Ms. Menghini's personal and sex life: "**A woman who looks like you – why don't you have a man?  What's wrong?  Have you been damaged?**"  Ms. Menghini felt no reason to share her personal life with Dr. Bolognese, and as such, he would continue to ask her similar questions when she chose not to respond.

59.    Unable to endure the continued discriminatory environment Dr. Bolognese created in the operating room with Ms. Menghini, she complained to her supervisor, Mr. Mascarelli.

60.    On November 5, 2014, Ms. Menghini wrote in an email to Mr. Mascarelli:

> **Rob, I have spoke with you at length, that I am uncomfortable with the language, and topics of discussions in the OR with certain attendings. ...** *[I]n other words, you simply do not care how your female employees feel when placed in inappropriate positions*.

61.    The very next day, Mr. Mascarelli responded and stated that Ms. Menghini would be expected to continue to work with Dr. Bolognese due to "schedule availability and the hours we are set to work for the day" and assured Ms. Menghini that a male PA had been hired to assist Dr. Bolognese, *but that PA would not be able to start until February*.  A number of other

individuals were also copied on that email, including Dr. Mihai Dimancescu, NSPC's Chief Administrative Officer.

62.     Dr. Dimancescu also responded, stating: "the cooperation of all PAs in accepting the different tasks assigned by NSPC, whether more or less desirable, is essential to maintaining a smooth practice."  Dr. Dimancescu's response underscored the fact that NSPC neither addressed the situation with Dr. Bolognese, despite implicitly acknowledging that it created a hostile work environment for Ms. Menghini, but also prioritized a "smooth practice" over a work environment free from discrimination.   Furthermore, his characterization of Ms. Menghini's complaint as a mere preference against a "less desirable" assignment minimized the seriousness of her complaint.

63.     In or around December 2014, a service representative for some of the instruments used in surgery joined Dr. Bolognese and Ms. Menghini, along with the rest of the surgical staff, for a surgery.  The service representative had recently gotten married, and Dr. Bolognese asked him about his married life.  The representative beamed and stated that he was very happy.   In response, Dr. Bolognese stated: "**Just wait, her mask will come off soon enough,**" referring to the service representative's wife.

64.     In or around January 2015, Dr. Bolognese and the rest of his staff, including Ms. Menghini, were discussing world history while operating on a patient.  During the course of that discussion, Dr. Bolognese declared: "**Most women who rise to power have done so with their legs open.**"

65.     In or around February 2015, Dr. Bolognese, again fixating on why Ms. Menghini was not married and was not discussing her dating life with him, stated to Ms. Menghini: "I can't be alone. I don't want to be alone."  Ms. Menghini, in response, stated that she was not interested

in a marriage in which she would not only hold her job, but also cook and clean up after another

individual.  Dr. Bolognese blurted out: "**Well, my wife is my servant**."

**Dr. Bolognese's Unsafe Surgical Practices**

66.     In addition to his highly offensive conduct, Ms. Menghini also felt that Dr.

Bolognese took excessive and unnecessarily long breaks during surgeries – extending the period

in which patients remained under anesthesia – which she and others felt were to the detriment of

patients, and she complained about it verbally to Mr. Mascarelli.[4]

67.     On one instance, for a surgery scheduled to last seven hours, approximately five-

and-one-half hours into the surgery, Dr. Bolognese indicated that he was closing up the patient,

with only two steps left to complete so that he could take a break.  Ms. Menghini expressed

confusion at why he was stapling up the patient's wound and not completing the surgery as so

few steps remained.  Dr. Bolognese left, and did not come back for **over an hour**, taking an

extremely long lunch.  While Dr. Bolognese was gone, the patient remained under anesthesia and

all of the surgical staff remained in the room.

68.     Dr. Bolognese took what Ms. Menghini believed were excessive and

unnecessarily long breaks such as the instance referenced above on numerous occasions.  Ms.

Menghini never observed Dr. Bolognese inform patients that they would remain under anesthesia

---

[4]     See M. Boruk, B. Chernoblisky, R. Rosenfeld & G. Har-El, *Age as a Prognostic Factor for Complications of Major Head and Neck Surgery*, 7 ARCH OTOLARYNGOL HEAD NECK SURGERY 131 (July 2005) ("Time under general anesthesia showed a statistically significant relationship with complication rate and hospital length of stay in multivariate analyses").

while he took a long lunch or other break and never informed patients after any surgery that they

had remained under anesthesia for longer than she believed was required.[5]

69.     This is consistent with what Ms. Menghini felt was Dr. Bolognese's lax attitude

towards his patients who put their lives in his hands, as it was reported that he even went so far

on one occasion as to not show up for a scheduled surgery.[6]

70.     While Ms. Menghini was disturbed by what she believed was Dr. Bolognese's

blithe nature with taking lengthy breaks while performing surgeries, she was well aware from her

experience at NSPC that many of its surgeons are less than concerned with patient safety and

best surgical practices – she had previously observed and complained about Dr. Rak's dangerous

surgical practices.

71.     Indeed, Ms. Menghini is not the only person to have raised complaints about Dr.

Bolognese's surgical practices as Dr. Bolognese has had no fewer than *20* malpractice suits

instituted against him within the last ten years for his failure to exercise due care,[7] including one

suit alleging that he was scheduled for a surgery and simply did not show up for it.[8]

---

[5]     See Jonathan Benson, *Patient Dies After Surgeon Takes Lunch Break During Kidney Operation*, NATURAL NEWS, September 15, 2012, *available at* http://www.naturalnews.com/037204_kidney_surgery_patient_deaths_surgeons.html.

[6]     See Howard Koplowitz, *UCLA surgeon backs LIJ's Chiari Institute*, TIMES LEDGER, May 12, 2010, *available at* http://www.timesledger.com/stories/2010/19/bt_chiari_folo_20100506.html ("Bolognese was scheduled to perform the surgery, **but he could not be reached by the hospital** and the hospital could not find another surgeon to perform the surgery.") (emphasis added).

[7]     See *Bowman, et al. v. Bolognese, et al.*, No. 700953/2012 (N.Y. State Sup. Ct., Cty. of Queens, filed May 30, 2012) (improper use of Infuse, bone morphogenetic protein, leading to bone growth into the brain); *Chiusano, et al. v. North Shore University Hospital at Manhasset, et al.*, No. 600232/2012 (N.Y. State Sup. Ct., Cty. of Nassau, filed February 14, 2012); *Schultz v. Bolognese, et al.*, No. 2:12-cv-00352(PSG)(PJW) (C.D. Ca. filed January 13, 2012); *Emmett, et al. v. Bolognese, et al.*, No. 2:11-cv-7794(DDP)(PJW) (C.D. Ca. filed Sept. 21, 2011); *Fetterly,*

72.     As such, Ms. Menghini's complaints to Mr. Mascarelli were based on her good

faith belief that Dr. Bolognese was not acting in the best interests of patients when performing

surgeries.

**Ms. Menghini's Retaliatory Termination**

73.     Upon information and belief, on or around February 23, 2015, Dr. Brisman was

walking around NSPC's main offices in Rockville Centre, musing aloud: "We're downsizing –

do we even need this guy for Bolognese?  Jean is doing his surgeries too," referring to the male

PA who had been hired to be Dr. Bolognese's PA per Mr. Mascarelli's email to Ms. Menghini so

---

*et al. v. Bolognese, et al.*, No. 2:10-cv-4260(AKT) (E.D.N.Y. filed Sep. 17, 2010) (craniocervical fusion surgery - more extensive than thought to be, unnecessary tethered cord surgery - leading to memory loss, fatigue, hand tremors, clicking sound in head, severe pain); *Walker v. Bolognese, et al.*, No. 2:10-cv-00621(JFB)(AKT) (E.D.N.Y. filed Feb. 11, 2010) (unnecessary tethered cord surgery); *Colen v. Bolognese, et al.*, No. 2:10-cv-5701(DRH)(AKT) (E.D.N.Y. filed Dec. 9, 2010) (unnecessary tethered cord surgery); *Bolger v. Bolognese, et al.*, No. 2:10-cv-2687(JMA)(AKT) (E.D.N.Y. filed Jun. 14, 2010) (same); *Tumblin v. Bolognese, et al.*, No. 2:10-cv-2284(DRH)(AKT) (E.D.N.Y. filed May 19, 2010) (same); *Schmeider, et al. v. Bolognese, et al.*, No. 2:10-cv-1465(JS)(AKT) (E.D.N.Y. filed Apr. 1, 2010) (same); *Caldwell, et al. v. Bolognese, et al.*, No. 2:10-cv-1271(JMA)(AKT) (E.D.N.Y. filed Mar. 19, 2010) (same); *Witty, et al. v. Bolognese, et al.*, No. 2:09-cv-5621(AKT) (E.D.N.Y. filed Dec. 23, 2009) (same); *Blair, et al. v. Bolognese, et al.*, No. 2:09-cv-5230(DRH)(AKT) (E.D.N.Y. filed Nov. 30, 2009) (same); *Ronca, et al. v. Bolognese, et al.*, No. 19484/2009 (N.Y. State Sup. Ct., Cty. of Nassau, filed Nov. 13, 2009); *Spampata, et al. v. Bolognese, et al.*, No. 2:09-cv-3031(JS)(AKT) (E.D.N.Y. filed Jul. 15, 2009); *Vercher, et al. v. Bolognese, et al.*, No. 2:09-cv-1836(AKT) (E.D.N.Y. filed Apr. 30, 2009); *Vercher, et al. v. Bolognese, et al.*, No. 2:09-cv-1835(SIL) (E.D.N.Y. filed Apr. 30, 2009); *Bryant, et al. v. Bolognese, et al.*, No. 2:09-cv-1751(AKT) (E.D.N.Y. filed Apr. 29, 2009); *Gherardi v. Bolognese, et al.*, No. 2:08-cv-4160(JS)(ETB) (E.D.N.Y. filed Oct. 14, 2008) (failure to untether spinal cord prior to craniocervical fusion, leading to cerebral palsy, paralysis - confined to wheelchair, nerve damage issues, etc.); *Boggs, et al. v. Bolognese, et al.*, No. 2:08-cv-00719(JS)(ARL) (E.D.N.Y. filed Jan. 21, 2008) (craniocervical fusion – in extraction).

[8]     See *Ronca, et al. v. Bolognese, et al.*, No. 19484/2009 (N.Y. State Sup. Ct., Cty. of Nassau, filed Nov. 13, 2009). "The patient . . . was prepped for surgery, including having her head shaved, but she had to be awakened from the anesthesia and was told the operation had never taken place." See Howard Koplowitz, *UCLA surgeon backs LIJ's Chiari Institute*, TIMES LEDGER, May 12, 2010, *available at* http://www.timesledger.com/stories/2010/19/bt_chiari_folo_20100506.html.

that a woman would not have to endure the discriminatory environment that Dr. Bolognese created in his operating room.

74.     Upon information and belief, an individual near Dr. Brisman spoke up and reminded him of Ms. Menghini's complaint, stating: **"Jean has had a big issue with [Dr. Bolognese's] language.  She even wrote an email to Dimancescu."** Dr. Brisman responded, **"You're kidding me!"** incredulous at the thought.

75.     In a clear act of retaliation, when layoffs were announced two short weeks later, Mr. Mascarelli and Dr. Dimancescu informed Ms. Menghini that NSPC was downsizing and that she was being let go because her **"name kept coming up with certain people."**

76.     Mr. Mascarelli and Dr. Dimancescu were quick to assure her that **"This has nothing to do with Hilda's case,"** [9] demonstrating that they were well aware that Ms. Menghini might complain that her termination was unlawful.

77.     Clearly, Defendants desired to get rid of Ms. Menghini, who had raised complaints about discriminatory and offensive conduct as well as unsafe surgical practices, and attempted to do so under the "cover" of layoffs.

**Retaliation Post-Termination**

78.     Upon her termination, Ms. Menghini received a letter from NSPC's counsel dated March 9, 2015, detailing her separation options.

79.     Given that Ms. Menghini signed a contract that required 90 days' notice from either party to terminate employment, the letter included the following provisions:

---

[9]     NSPC is currently a defendant in an action filed in the Federal District Court of the Eastern District of New York, alleging disability discrimination and retaliation, and retaliation for complaints made regarding selling surgeries to patients. See *Mayer v. NSPC et al.*, 1:15-cv-0864(DRH)(ARL) (E.D.N.Y. filed on February 18, 2015).

The first option is that you can continue to provide services and receive compensation pursuant to your Employment Agreement and its Addendum until June 9 2015. . . .

Your other option would be to stop providing services as of today's date. If you choose this option, you would receive eight (8) weeks of severance pay. During those eight (8) weeks, you would be required to pay 25% contribution toward your health insurance. At the conclusion of the eight (8) weeks, you would be entitled to COBRA benefits as explained in a letter from NSPC, or you would need to procure your own health insurance.

80.     As can be plainly seen, there is no requirement or even suggestion that Ms. Menghini release any claims against NSPC in connection with either option.

81.     Ms. Menghini selected the second option in writing on March 12, 2015.

82.     From the moment Ms. Menghini accepted the second severance offer, a contract was created.  The contract included an offer, acceptance and consideration (among others, Ms. Menghini agreed to forego the 90-day notice period she was entitled to under the contract).

83.     At that time, Ms. Menghini also complained that her termination was unlawful and retaliatory.

84.     That same day, Defendants further retaliated against Ms. Menghini by refusing to pay the severance unless Ms. Menghini agreed to release all her claims against Defendants.

85.     Ms. Menghini has not received any severance payment from NSPC.

## <u>FIRST CAUSE OF ACTION</u>
### (Harassment and Discrimination in Violation of Title VII)

86.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

87.     Defendants have discriminated against Plaintiff on the basis of her gender in violation of Title VII by subjecting Plaintiff to disparate treatment based upon her gender

including, but not limited to, subjecting her to sexual harassment and a hostile work environment and refusing to investigate her complaints of sexual harassment and discrimination.

88.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

89.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

90.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of Title VII)**

91.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

92.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of Title VII by not engaging in any investigation of her complaints and ultimately terminating her employment.

93.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

94.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

95.    Defendants' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Whistleblower Retaliation in Violation of New York Labor Law § 215)

96.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

97.    NYLL § 215 provides that it is unlawful to discriminate or retaliate against an employee because such employee has made a complaint that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of the NYLL.

98.    Defendants terminated Plaintiff's employment and subjected Plaintiff to the adverse employment actions described herein in retaliation for Plaintiff's complaints of Defendants' conduct that Plaintiff reasonably and in good faith believed to constitute violations of Chapter 31 of the NYLL.

99.    The sections of Chapter 31 of the NYLL which are implicated by Plaintiff's complaints include, *inter alia*, NYLL §§ 741 and 200.

100.    By the conduct described above, Defendants violated NYLL § 741 when they retaliated against Plaintiff, up to and including her termination, because she objected to and/or

disclosed and/or threatened to disclose a policy or practice of Defendants that she reasonably believed constituted improper quality of patient care; *inter alia*, that Dr. Ramin Rak should be replacing bone flaps onto patients' skulls after operating on them to reduce the instance of infection, and that Dr. Paolo Bolognese took unnecessarily long breaks during surgeries with patients under anesthesia.

101.    Defendants violated NYLL § 200 when they retaliated against Plaintiff because she complained about, objected to and/or opposed an assault and battery against her by Dr. Ramin Rak in an operating room.

102.    The conduct described above constitutes a single, continuing violation of NYLL §§ 741 and 200.

103.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary, compensatory and punitive damages, and any and all other remedies available under law, in addition to recovery of all attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the New York Labor Law § 741)

104.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

105.    NYLL §741 provides that it is unlawful to discriminate or retaliate against an employee because such employee objects to, discloses or threatens to disclose a policy or practice of the employer that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

106.    By the conduct described above, Defendants violated NYLL § 741 when they retaliated against Plaintiff, up to and including her termination, because she objected to and/or

disclosed and/or threatened to disclose a policy or practice of Defendants that she reasonably believed constituted improper quality of patient care; *inter alia*, that Dr. Ramin Rak should be replacing bone flaps onto patients' skulls after operating on them to reduce the instance of infection, and that Dr. Paolo Bolognese took unnecessarily long breaks during surgeries with patients under anesthesia.

107.    The conduct described above constitutes a single, continuing violation of NYLL § 741.

108.    As a direct and proximate result of NSPC's unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary, compensatory and punitive damages, and any and all other remedies available under law, in addition to recovery of all attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
### (Discrimination and Harassment in Violation of the NYSHRL)

109.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

110.    Defendants have discriminated against Plaintiff on the basis of her sex in violation of the NYSHRL by denying her equal terms and conditions of employment, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and sexual harassment.

111.    Defendants have discriminated against Plaintiff on the basis of her sex in violation of the NYSHRL by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

112.    The conduct described above constitutes a single, continuing violation of the NYSHRL.

113.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

114.   As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of damages.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL)

115.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

116.   Defendants retaliated against Plaintiff for her engagement in protected activities, including, but not limited to, opposing Defendants' discrimination against her.

117.   By the conduct described above, Defendants have retaliated against Plaintiff, including, but not limited to, terminating her employment, refusing to pay her severance payments and/or breaching the contract with Ms. Menghini related to severance pay.

118.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of past and future income, compensation and benefits for which Plaintiff is entitled to an award of damages.

119.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which Plaintiff is entitled to an award of damages.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract)

120.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

121.    Plaintiff and Defendant NSPC entered into a binding contract whereby Defendant were required to pay Plaintiff a severance of eight (8) week's salary, and in exchange Ms. Menghini agreed to forgo the 90 days' notice period in her contract.

122.    As described above, Defendant breached the contract by refusing to pay Ms. Menghini the eight (8) weeks of severance.

123.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has been damaged in an amount to be determined at trial together with prejudgment interest pursuant to the New York Civil Practice Law and Rules.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the state of New York;

B.    An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.      An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

E.      An award of damages to be determined at trial, to compensate Plaintiff for physical injuries, emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

F.      An award of punitive damages in an amount to be determined at trial;

G.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law;

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 17, 2015
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
       David E. Gottlieb
       Elizabeth J. Chen

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dgottlieb@wigdorlaw.com
echen@wigdorlaw.com

*Attorneys for Plaintiff*